**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia Garcia, | No. CV-16-01023-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| JP Morgan Chase Bank NA, et al., | |
| Defendants. | |

In July 2015, Plaintiff Patricia Garcia filed a verified complaint against Defendants JP Morgan Chase Bank N.A. ("Chase") and Bank of America N.A. (BANA) in case number CV-15-01493-PHX-DLR ("*Garcia I*"), alleging that Defendants broke promises, acted negligently, committed fraud, and otherwise violated the law while evaluating Garcia for a home loan modification. Roughly nine months later, Garcia filed this case ("*Garcia II*") questioning Defendants' relationship to her loan and seeking, *inter alia*, an order quieting title in her favor. In April 2017, however, the Court granted summary judgment in favor of Defendants on all claims asserted against them in *Garcia I* and, in so doing, found that BANA purchased Garcia's loan in 2007 and at all relevant times possessed it through Chase, which services the loan on BANA's behalf. The Court now considers whether this matter should be dismissed in light of the disposition of *Garcia I*. For the following reasons, the Court finds that claim preclusion principles require dismissal of this action.

Central to the question before the Court is whether Defendants' relationship to Garcia's loan—an issue characterized interchangeably throughout these cases as whether Defendants "own" the loan, are the "note holder," or have "standing to foreclose"—was at issue in *Garcia I* such that the claims asserted in these two cases may be deemed transactionally related. The Court therefore recounts the relevant factual and procedural history of both cases, with special emphasis on the ownership issue.

## I. Garcia Attempts to Obtain a Home Loan Modification[1]

On December 13, 2006, Garcia executed a promissory note ("note" or "loan") in the principal amount of $830,000 in favor of Washington Mutual Bank, F.A. ("WaMu"). (Doc. 278 at 3 in *Garcia I*.) Garcia also executed a deed of trust in favor of WaMu, which secured the note using real property in Scottsdale, Arizona as collateral. (*Id.*) BANA purchased the note from WaMu in 2007, and at all relevant times BANA possessed the note through Chase, which services the loan on BANA's behalf. (*Id.*) Though Garcia generally paid the loan on time, she began missing payments in late 2012, and by April 2014 stopped making payments entirely because "she simply had run out of funds to pay her mortgage[.]" (*Id.* at 3-4.)

During this period, Garcia applied several times for a home loan modification. (*Id.*) Defendants offered Garcia a permanent loan modification in February 2015, but Garcia did not execute the agreement because it required her to represent that her home was not in a state of disrepair. (*Id.* at 4.) Garcia's home had flooded in late 2014, and she could not make such a representation in light of the flood damage. (*Id.*) After Garcia experienced medical problems, and upon request by her attorneys, Defendants agreed to cease default-related communications. (*Id.* at 5-6.) Garcia, however, did not make any further payments on her loan, nor did she repair the flood damage and reapply for a loan modification. (*Id.* at 6-7.) Consequently, Defendants noticed a trustee's sale of the

---

[1] A more detailed discussion of the history leading to these lawsuits can be found in this Court's April 5, 2017 order granting summary judgment in favor of Defendants on all claims asserted against them in *Garcia I*. (Doc. 278 in *Garcia I*.)

Scottsdale property in May 2015.  (*Id.* at 7.)

The looming trustee's sale prompted Garcia in July 2015 to file a verified complaint against Defendants in Maricopa County Superior Court, alleging eight claims related to her loan modification efforts and Defendants' foreclosure-related activities:  (1) promissory estoppel, (2) breach of the covenant of good faith, (3) fraud, (4) negligence, (5) negligent performance of an undertaking, (6) violation of the Arizona Consumer Fraud Act (ACFA), (7) violation of the Real Estate Settlement Procedures Act (RESPA), and (8) negligence per se.  (Doc. 1-1 at 18-44 in *Garcia I*.)  Defendants removed the matter to this Court soon thereafter.

**II.  Introduction of the Ownership Issue and the Filing of *Garcia II***

Although her verified complaint in *Garcia I* alleged that BANA is the current beneficiary of the deed of trust, and that Chase services the loan on BANA's behalf (Doc. 1-1 at 20, 31 ¶¶ 11, 13, 110-11 in *Garcia I*), Garcia began questioning Defendants' relationship to her home loan as early as February 2016.  For example, on February 5, 2016, Garcia's attorney, Daniel Cracchiolo, sent a letter to David Cowles, the trustee under the deed of trust, tendering $5.00 and demanding that BANA quiet title in Garcia's favor.  (Doc. 114-1 at 12-13 in *Garcia II*.)  The letter explained that Cyndee Rae Estrada, an expert witness Garcia had hired in connection with *Garcia I*, believed the BANA did not own Garcia's loan.  The issue arose again on February 19, 2016, when, during a private mediation, Garcia's attorneys indicated that they believed BANA and Chase lacked "standing" to foreclose.  (Doc. 39-1 ¶ 10 in *Garcia I*.)  Notably, though these issues arose well before the February 29, 2016 deadline for amending pleadings, Garcia never amended her verified complaint and the allegations therein remained operative throughout the case.

Rather than amend her verified complaint to remove the verified allegations regarding BANA and Chase's relationship to her loan and to add related claims, Garcia filed a separate verified complaint on March 14, 2016 in Maricopa County Superior Court "to determine the title and ownership of said property."  (Doc. 1-2 at 6 ¶ 17; Doc.

12 in *Garcia II*.)  Evidently, comments made by the private mediator in *Garcia I* led Garcia's attorneys to believe that the quiet title action was more appropriately brought in a separate state court lawsuit.  (Doc. 94 at 4 in *Garcia II*.)

**III.  Garcia Places Ownership "Directly" at Issue in *Garcia I***

Despite filing a separate action on the ownership question, Garcia kept pursuing the issue in *Garcia I*.  During a March 22, 2016 telephonic discovery dispute hearing in *Garcia I*, Garcia's attorney, Monique Wilhite, asked the Court to order Defendants to respond to inquiries "having to do with the ownership of the loan."  (Doc. 66 at 4 in *Garcia I*.)  She explained:

> During the discovery process we've learned that [BANA] is not the owner of the loan, and we learned this, one, because in some of the documents that we have that our client has indicated that [BANA] simply manages some type of public security in which her loan is supposed to exist.
>
> Furthermore, we found out that the loan when the loan was actually written—[WaMu] is the bank that the loan was written with—it was—it did not exist.  She wrote the loan in 2006 and [WaMu] was gone, did not exist after 2004, I believe.
>
> And we further have information from an actual employee of [BANA] indicating that the loan is not with [BANA].
>
> We believe that that is completely relevant because if [BANA] owns the loan they approve or disapprove any type of loan modification or settlement in this case, and so we need to make sure that we're dealing with the right party.
>
> So we believe that we're entitled to information regarding the whereabouts of this loan and who actually owns it so that we know we're dealing with the right person.
>
> Furthermore, during the modification process our client was told that [BANA] had approved the loan modification and different aspects of it.  If that was not the case, that further goes to the negligence and the other claims that we've made against Chase and how they handled this loan modification.

(*Id.* at 4-5.)  Ms. Wilhite specified that "the information we need" included "the prospectus for the trust where the loan is supposed to be, the credit default swap and credit swap default provider, the [master] sales and servicing agreement for the loan, the custodial agreement and [master] servicing agreement, those types of things."  (*Id.* at 8-

9.)

Bob Shely, counsel for Defendants, responded that Garcia:

> just filed a quiet title action in [s]tate [c]ourt raising this issue with [WaMu] and so forth. So there's a whole [other] litigation in which the question of the bank's role is at issue, and we will address those issues in that lawsuit, but they are not—the standing question is not at issue here.

(*Id.* at 9-10.) Ms. Wilhite, however, maintained that the ownership issue:

> *is directly relevant to our claim of negligence in handling the loan modification and the like.*
>
> Because Miss Garcia was told that Chase consulted with [BANA] regarding her modification and they had to approve it and those type of things, and now we have information that [BANA] does not even own the loan.
>
> So that's what we need to know. That's—and that information is absolutely relevant because if [BANA] doesn't own the loan and Chase was telling Miss Garcia that they did and that they had to approve her loan modification, *that goes directly to all of our claims.*

(*Id.* at 10-11 (emphasis added).)

After hearing the parties' arguments—and accepting Ms. Wilhite's representation that Defendants' relationship to Garcia's loan was directly relevant to all of the claims in *Garica I*—the Court ordered Defendants "to produce the documents the bank relies on to establish its ownership or relationship to the loan[.]" (*Id.* at 27.) As early as March 22, 2016, then, Defendants' relationship to Garcia's home loan was "directly" at issue in *Garcia I*. Indeed, Garcia raised the issue again two days later, in her Reply in Support of Motion for Sanctions. (Doc. 47 in *Garcia I*.) Specifically, she argued that Defendants "have no standing to foreclose nor do they have any ownership interest in the Garcia loan," and claimed that they could not settle the case because they could not document their ownership of the note and deed of trust. (*Id.* at 3-5.)

Meanwhile, on April 12, 2016, Defendants removed *Garcia II* and the case was assigned to this Court. The following day, the Court heard oral argument in *Garcia I* on Garcia's motion for sanctions, during which the ownership issue again emerged. Mr.

Cracchiolo argued:

> While this is not in the pleadings, we've certainly given [Defendants] plenty of notice. We think this is really a real party in interest type of case, and we so told the mediator that in their presence, and what we told the mediator is we didn't think that [BANA] was the owner of this promissory note and had really no authority to settle and really had no standing.
>
> And as I understand what the mediator did is he told us or told counsel for the defendant, [BANA], to see if the standing issue could be resolved, after which we would go in front of him again and see if we could resolve the matter.

(Doc. 68 at 6 in *Garcia I*.)  Thus, by April 12, 2016, there were two separate cases involving the same parties, the same general factual predicate, and the same ownership issue.

## IV.  Early Consolidation Efforts

Unsurprisingly, on May 24, 2016, Garcia moved to consolidate *Garcia I* and *Garcia II*.  (Doc. 79 in *Garcia I*.)  In her motion, Garcia represented that the two cases share common issues of law and fact, involve substantially the same transaction or event, and involve substantially the same parties.  She also stated that "one of the major issues in [*Garcia I*] is whether the Defendants had the authority to consider and offer Ms. Garcia a loan modification."  (*Id.* at 3.)  Likewise, "the main issue," in *Garcia II* "is whether Bank of America is the owner and beneficiary of the loan."  (*Id.*)

On June, 2016, Mr. Shely wrote to Garcia's counsel:

> Now that the Court has set dispositive motions dates and a trial date in *Garcia I*, it seems to me that he is unlikely to vacate those dates, so if he were to consolidate the two actions, he would have to consolidate under the rules to the first filed action.  We might be willing to stip[ulate] to consolidation if you folks wanted to cross notice the upcoming depositions of BANA, Chase and Moore for *Garcia II*, allow us just to use the depo[sition] transcripts of Mrs. Garcia that we have already taken in *Garcia I* for the purposes of *Garcia II*.  I think we have already produced all doc[uments] that would be relevant in both cases in *Garcia I*. If we can stipulate to use the dispositive motion deadline of this June 30, and the trial date of November 2016, then we would probably agree to consolidate just to take care of both cases sooner rather than later, which would allow a reduction in the amount of discovery that is needed, because really I don't think I need to retake Mrs. Garcia's depo[sition], and if

> we agree that you can depose the upcoming deponents for use in both cases, you would only have to take the depositions one time for both cases.
>
> Let me know your thoughts as soon as convenient.

(Doc. 178-1 at 6 in *Garcia I*.) Garcia's attorneys did not respond to Mr. Shely's email. Instead, on June 9, 2016 Garcia withdrew her motion to consolidate without explanation. (Doc. 87 in *Garcia I*.) Had she not done so, these matters likely would have been consolidated and the need for the present order obviated.

Nonetheless, counsel for Defendants still believed it would be more efficient to cross-notice Rule 30(b)(6) depositions in both cases, considering the substantial overlap in the issues. Counsel for Garcia, however, objected. Consequently, on June 15, 2016, the Court held a telephonic discovery dispute hearing in *Garcia II* to discuss the propriety of cross-noticing depositions. (Doc. 34 in *Garcia II*.) During that hearing, Mr. Cracchiolo reversed course and claimed that *Garcia I* and *Garcia II*:

> don't have the same issues. Although we said that, we were mistaken. The only same issue is . . . that they're the same parties . . . .
>
> [*Garcia I*] is the case for damages against Chase and [BANA] for negligence and other things because they failed to modify a loan in accordance with the dictates of TARP. Case number two is a quiet title action, completely different and has different areas of inquiry.
>
> . . . We maintain [Defendants] don't own the loan in [*Garcia II*], which is completely different than the matters set forth in [*Garcia I*].

(*Id.* at 5.) Based on representations from Garcia's counsel that they could not adequately prepare for the depositions on the timeline established in *Garcia I*, the Court denied Defendants' request to cross-notice the depositions. (*Id.* at 14.)

Later, during a June 23, 2016 Rule 16 Scheduling Conference in *Garcia II*, the Court remarked:

> I'm looking at this new complaint. This looks a lot like the old one. I mean, the issues look almost identical. It seems to me that the resolution of [*Garcia I*] is going to, if not decide, have a significant impact on the claims being alleged in the

second case. I don't know why we have two different cases.

. . .

[S]ome of the issues that have been raised involve whether or not the bank has an interest in the house. Isn't that one of the defenses or one of the claims that we're hearing in the other case?

(Doc. 47 at 3-4 *Garcia II*.) When asked what would be left to decide in *Garcia II* after resolution of *Garcia I*, Garcia's attorney, Barbara Forde, responded: "As far as my understanding . . . the actual issue of who's entitled to enforce the loan is not directly at issue in the first lawsuit[.]" (*Id.* at 4.) Forde's statement contradicted Ms. Wilhite's March 22, 2016 representation that the ownership issue was "absolutely relevant" and "goes directly to all of our claims" in *Garcia I*.

The Court explained:

I've heard a lot of arguments in [*Garcia I*] about discovery and that issue has been raised, at least by Mr. Cracchiolo, a number of times, as I understood what he was saying anyway.

. . .

It just seems inefficient to have two cases going that have pretty close if not exactly the same issues being litigated and will require the same witnesses and have the same facts and the same arguments. *I'm wondering why we don't consolidate them.*

(*Id.* at 4-5 (emphasis added).) In response, the following exchange occurred:

MS. FORDE: Well, that's a good question . . . and by the time I got involved, because the first lawsuit was so much further down the road, it turned out not to be workable because of the trial date and—

THE COURT: I don't see any additional discovery this case is going to need from what I've seen alleged in the complaint. What else do you need to know that wasn't discovered in the first lawsuit?

MS. FORDE: Well . . . from what I understand, what occurred at the depositions this week, and I wasn't there, as you know . . . there are—I sent out voluminous requests for production asking for all of the documents to show exactly what happened to this loan. Other than unsigned copies of some purchase agreements and such, nothing has been actually disclosed—

THE COURT: But that's—

MS. FORDE – revealing who actually owns this loan.

THE COURT: That's information you want for both lawsuits, though, right?

MS. FORDE: I'm sorry?

THE COURT: That is information you're requesting that pertains to both lawsuits.

MS. FORDE: I am not aware whether that has been requested in the first lawsuit. I know there were some documents, as I said, that were produced by Chase in the first lawsuit, but to the extent they were, many of them are illegible or they're documents that are not even executed. So they're not demonstrative of anything.

THE COURT: I can just see us litigating this one and then after the first case is resolved either through a motion or a trial there's going to be motions in this case for preclusion or some sort of estoppel, collateral estoppel, or res judicata because the issues just seem to be pretty darn identical.

I don't know what else to say. That's just—from what I understand has been argued to me in the past in that other case regarding the need for discovery, they've explained to me from your side where you're going with it—where they're going with it and why they need it and what their theories are for the need for that information and the need of that discovery and it sure seems to track what's being alleged here in this second lawsuit.

(*Id.* at 5-7.)

Several things are notable about this exchange. First, Ms. Forde indicated that the two cases had not been consolidated because Garcia felt the schedule in *Garcia I* was not workable for *Garcia II*. Yet, during the Court's June 15, 2016 telephonic conference to discuss cross-noticing depositions, Mr. Cracchiolo claimed that the cases were not consolidated, in part, because they "don't have the same issues[.]" (Doc. 34 at 5 in *Garcia II*). Second, though the Court asked whether the two cases should now be consolidated, Garcia's attorneys did not at that time renew their request to consolidate the two matters. Third, Ms. Forde stated that she did not know the nature of the discovery that had occurred in *Garcia I*, but Mr. Cracchiolo was present at the hearing and he is common counsel in both *Garcia* I and *Garcia II*. Thus, at least one of Garcia's attorneys

in *Garcia II* was aware of the discovery that had been demanded and pursued in *Garcia I*.

Indeed, Defendants' attorney, Greg Iannelli, informed the Court that:

> There were, I think, in excess of 700 documents on this—700 pages of documents on this precise issue just recently disclosed within the past 30 days, and there were three people deposed about it this week.
>
> And I can understand if maybe the position of the plaintiff is that, well, that doesn't prove what Chase needs to establish. Well, that goes to the merits. That doesn't go to whether we need to have a second case and a second round of discovery on all of this.

(Doc. 47 at 7-8 in *Garcia II*). Though Ms. Forde asserted that she had not been provided those documents because she was not involved in *Garcia I*, Mr. Iannelli noted: "Mr. Cracchiolo, who is also of counsel in this lawsuit, is, of course, as you know, counsel in the first lawsuit and privy to all of these productions and deposition that have occurred." (*Id.* at 8-9.)

The Court voiced concerns about duplicating discovery in *Garcia II* that had already been conducted in *Garcia I*, and to which Mr. Cracchiolo already was privy. The Court also stated that "[t]his should have been consolidated and brought in one cause of action." (*Id.* at 14.) Ms. Forde responded "we certainly are open to that, but we do need additional time to get the information that was never obtained[.]" (*Id.*) The Court then set case management deadlines for *Garcia II*, and concluded the hearing as follows:

> I'd really like you guys to get together and go over what you really need . . . I suspect almost everything you're going to look for has already been disclosed at some point or another. . . . I'd like to see you avoid expending a lot of time and money on discovery in this case since so much has been done in the other case.

(*Id.* at 20.)

## V. Continued Litigation of Ownership in *Garcia I*

Despite Mr. Cracchiolo's representations on June 15, 2016 that *Garcia I* and *Garcia II* "don't have the same issues," Garcia continued to raise the ownership issue in *Garcia I*. In her July 13, 2016 cross-motion for sanctions, Garcia again explained that

she had discovered information indicating "that Defendant BANA did not own her loan," and noted that the Court already had "determined the issue of the ownership of the loan was relevant to Ms. Garcia's claims[.]"  (Doc. 102 at 8-9 in *Garcia I*.)  Later, in her July 27, 2016 Motion for Court to Order Return of Insurance Proceeds So that Plaintiff May Repair Her Home, Garcia repeated these claims and argued that Chase is not entitled to possession of insurance proceeds because Defendants do not own or otherwise have a relationship to her loan.  (Doc. 112 at 7-8 in *Garcia I*.)  She made similar claims in filings on September 1 and 30, 2016.  (Docs. 141, 170 in *Garcia I*.)

**VI.  Renewed Motion to Consolidated and the Court's Order to Show Cause**

On September 1, 2016, Garcia filed a motion to amend her verified complaint in *Garcia II* to add a host of new claims.  (Doc. 46 in *Garcia II*.)  Many of her new claims, including those sounding in fraud, related at least in part to her loan modification efforts. Defendants opposed Garcia's motion, contending that the proposed amended complaint "just restates the allegations and claims that the parties already litigated in *Garcia I*, primarily because of self-imposed errors in *Garcia I* that she seeks to correct in the re-litigation of the case in *Garcia II*."  (Doc. 55 at 1 in *Garcia II*.)  Later, on September 20, 2016, Garcia filed a new motion to consolidate *Garcia I* and *Garcia II*.  (Doc. 51 in *Garcia II*.)  Once again reversing course, Garcia argued that the two cases shared common issues of fact and law, namely the ownership issue.  She also requested that the Court vacate and reset discovery deadlines in *Garcia II*.

This time, Defendants opposed the request.  (Doc. 68 in *Garcia II*.)  Defendants argued that they "would be severely prejudiced by consolidation" at this stage because "[u]nder Garcia's proposed Amended Complaint, and proposed consolidation plan, all discovery and efforts in *Garcia I* would be lost to a new round of discovery and evidence in *Garcia II* that would eliminate the impact of all the Defendants' work in *Garcia I*." (*Id.* at 11.)  Indeed, beginning in late June 2016 and continuing into mid-September 2016, Defendants filed several motions in *Garcia I* seeking to preclude Garcia from introducing evidence that Defendants alleged had been improperly withheld or untimely disclosed.

(Docs. 99, 122, 145 in *Garcia I*.)  Defendants believed that Garcia's latest consolidation request was an effort to "discover, disclose and introduce evidence and theories in *Garcia II* that she might not be able to introduce in *Garcia I* if the Court grants the Defendants' Rule 37 motions."  (Doc. 68 at 2 in *Garcia II*.)  Defendants also argued that Garcia sought "to push off the deadlines of summary judgment in both *Garcia I* and *Garcia II*, and to vacate all of the deadlines in *Garcia II*, and require the Defendants to endlessly re-litigate this dispute again in the context of the proposed amended complaint in *Garcia II*."  (*Id.*)

On October 28, 2017, the Court held a telephonic hearing on the motion to consolidate.  (Doc. 91 in *Garcia II*.)  The Court began by discussing the allegations in the proposed amended complaint and inquiring about the common issues of fact and law:

> THE COURT:  Thank you.  Okay.  We are here on the motion to consolidate and vacate discovery deadlines.  I have taken a quick look at the proposed amended complaint.  You have five new counts.
>
> Count one is a [declaratory judgment] action on the standing; and count two, quiet title; three, intentional interference in contractual relations; four, intentional infliction of emotional distress; and five, fraud.
>
> And by my quick analysis, it looks like all of them are based on the claim that, there's an underlying issue on the ownership of the plaintiff's loan.  Is that the underlying basis of all of those counts?
>
> MS. FORDE:  I believe that's true, Your Honor, except perhaps with the exception of the 33-420 claim, which I think also has to do with whether David Cowles was an appropriate trustee, whether he received instruction to foreclose from the lender.
>
> THE COURT:  Okay.  And then in the motion, you argue that the deadlines for dispositive motions, motion in limine, et cetera, should be consolidated in the two cases, and you go on to say that these cases basically involve common questions of law and fact; is that what you are saying?
>
> MS. FORDE:  In the motion to consolidate, that's what the motion to consolidate is about, yes, Your Honor.
>
> THE COURT:  And the common issue of law and fact all stems from the ownership of the loan; is that pretty much what we—

. . .

THE COURT: . . . I know there's been—throughout *Garcia I*, there's a question of ownership of the loan. That looks like what *Garcia II* is about, too; am I right, or am I wrong on that?

MS. FORDE: *Garcia II* is about who the proper party is to enforce the loan, yes. And I know that that became an issue in *Garcia I*, as it related to determining who could modify the loan.

. . .

THE COURT: What's the common question between . . . both cases? Is it the loan?

MS. WILHITE: Yes, that's one of them.

THE COURT: Ownership of the loan?

MS. WILHITE: Yes, but there are different issues in *Garcia I* than there are in *Garcia II*.

. . .

THE COURT: Well, let me ask you this. Everything in *Garcia II* relies on—is based on the claim that there's loan ownership that's in dispute?

MS. FORDE: Virtually everything other than the possible exception I discussed about 33-420.

THE COURT: And that issue is already raised in *Garcia I*, the ownership of the loan.

MS. WILHITE: Yes, Your honor. It was raised, but it wasn't the core issue of the complaint, because when we filed the complaint, we had no idea that there was an issue of whether or not [BANA] owned the loan.

THE COURT: But it became an issue once you discovered the facts?

MS. WILHITE: Right.

(*Id.* at 3-7.)

The Court then reiterated its concerns about Garcia's decision to file a separate lawsuit rather than amend the complaint in *Garcia I*:

THE COURT: Okay. That's what I am having trouble with. Because it seems that we've got a case where there shouldn't be two lawsuits here, there should only be one. Am I missing

something here?

MS. WILHITE:  Well, Your Honor, I don't—I believe that the time to—and I am not sure, to amend the complaint had—I am not sure if we could have amended the complaint by time purposes or for time purposes in *Garcia I* but—

THE COURT:  Well, that's not how you amend complaints, by filing new lawsuits.  If you've got a new lawsuit and it involves issues, you move to amend the complaint, and if there's good cause, you get an amendment.

MS. WILHITE:  I understand, Your Honor, but we made the decision to go forward in state court on that claim, and then it was removed to federal court.

THE COURT:  Because I have gone through this file and there's lots of contradictory indications from plaintiff as to whether or not these are the same case or if they are different cases.  You start out saying that they are the same, should be consolidated.  Later said they are not.  Now we're back to they're the same.  I think they're the same case.

. . .

THE COURT:  Okay. Here's what's troubling me.  This shouldn't be two lawsuits, and it never should have been filed that way—potentially.  I don't know why, but that's what I am hearing.  So I am wondering—this is called claim splitting, and that's not appropriate, if that's what's happening here.

(*Id.* at 8-9.)  The Court also explained that the Scheduling Order's deadline for amending pleadings does not "mean you can't file a motion to amend, it just means there's a little higher burden to get it, but you can still do that." (*Id.* at 17.)

The Court then allowed Defense Counsel to speak on the issue:

MR. SHELY:  . . . [W]hat we would have expected was either for them to file a motion later in February, because they knew the issue before that deadline hit, or to approach us.

We hadn't really started discovery in earnest.  We had been in mediation to that point, and to say, there's no prejudice, can we have another couple of weeks to file a motion?  I would have probably said, you don't need to file a motion because we really aren't prejudiced and I don't even want to have that fight.

But what they did was file . . . the separate lawsuit . . .

THE COURT:  In state court?

MR. SHELY:  They filed it in state court, correct.

- 14 -

. . .

MR. SHELY: My clients didn't want to be in state court, so we moved it to federal court. And through happenstance, it landed on Your Honor's desk.

. . .

THE COURT: . . . Let me just ask you . . . is it your perception of the plaintiff's claim that both claims have the underlying issue of who owns the note?

MR: SHELY: Yes, Your honor.

. . .

MR. SHELY: And . . . we litigated and discovered the living daylights out of that issue in *Garcia I.*

(*Id.* at 17-20.)

After hearing further arguments from both sides, the Court stated:

What I am getting a sense of here, based on what I have heard today and what I read in these pleadings and what I have been involved in with this case, is that the *Garcia II* action was brought as a strategy to get around the requirements of *Garcia I*, the rules of procedure.

And instead of filing a motion to amend you filed a second lawsuit that involved the same claims, same issues, same parties. And a second shot at discovery, a second shot at additional damages that apparently weren't properly pursued in the first case.

So I am going to issue an Order to Show Cause as to why *Garcia II* should not be dismissed under the rule against claim splitting. Plaintiff explained she filed a separate lawsuit instead of moving to amend, simply because she wanted to avoid having to file a motion to amend, I guess, I am not sure.

. . .

So despite the contradictory indications, representations throughout these pleadings as to what the issues are, it's clear that the ownership of plaintiff's loan is an issue in *Garcia I*, as well as the issue in *Garcia II*. And . . . the theories in the claims in *Garcia II* look like they should have been raised in *Garcia I*. The parties are identical, the issues are similar, so I need an explanation as to why this *Garcia II* should not be dismissed under the rule against claim splitting.

(*Id.* at 35-36.) The Court also denied the motion to consolidate, and declined to alter the

- 15 -

schedule in *Garica I.* (*Id.* at 37, 40-41.)

The parties completed full briefing on the order to show cause on January 12, 2017, but during this time summary judgment briefing began in *Garcia I.* In her reply to the Court's Order to Show Cause, Garcia argued, *inter alia*, that instead of dismissing *Garcia II*, the Court has discretion to stay it pending the outcome of the earlier-filed action. (Doc. 109 at 6 in *Garcia II.*) Accordingly, given that *Garcia I* was in the midst of dispositive motions briefing, the Court chose to defer action on the order to show cause in *Garcia II* pending resolution of Defendants' summary judgment motion in *Garcia I.*

**VII. Resolution of *Garcia I***

In their *Garcia I* summary judgment motion, Defendants thoroughly addressed the ownership issue. (Doc. 203 in *Garcia I* at 2-3, 6-8.) Garcia, however, failed to engage with the issue in her response brief. In fact, she reversed course again and denied that ownership of the loan was of any "genuine consequence" to the summary judgment motion because the issue "is the object of '*Garcia II*' as opposed to this case[.]" (Doc. 234 at 7-8 in *Garcia I.*)

On February 3, 2017, the Court heard oral argument on Defendants' motion for summary judgment in *Garcia I*, during which it asked Garcia's counsel about the ownership issue:

> THE COURT: Can you confirm whether you are in any way challenging defendants' ownership of the loan in this case?
>
> . . .
>
> MR. KUNZ: . . . Paragraphs 110 and 111 [of the verified complaint] says that BANA owns the loan and that Chase is the servicer. That was alleged. It was admitted. I don't see how it could be otherwise in this case . . . .
>
> . . .
>
> THE COURT: So your answer is that ownership of the loan is not an issue in this case?
>
> MR. KUNZ: Not as all so far as I am aware . . . . Not in *Garcia I.* As I understand it, there's something about *Garcia II* which raises that . . . .

. . .

MR. KUNZ: It's not an issue in this case, as I understand . . . .

THE COURT: The ownership of the loan has been raised a number of times in the time we've been in this case, and I just want to confirm. You're saying there is no issue?

MR. KUNZ: That's—based upon the pleadings as I read them, Your Honor, I don't see how there could be an issue.

(Doc. 261 at 27-28 in *Garcia I*.)

On April 5, 2017, the Court entered summary judgment in favor of Defendants on all claims in *Garcia I*. (Doc. 278 in *Garcia I*.) In its order, the Court found, based on the undisputed evidence in the summary judgment record, that "BANA purchased the Note from WaMu in 2007, and at all relevant times BANA possessed the Note through Chase, which services the loan on BANA's behalf." (Doc. 278 at 3 in *Garcia I*.)

Shortly thereafter, the Court ordered supplemental briefs in *Garcia II* to address the impact of the summary judgment order in *Garcia I* on the claim-splitting issue, the allegations in the operative and proposed amended complaints, and Garcia's ability to pursue claims in *Garcia II* that contradict her position in *Garcia I*. (Doc. 112 in *Garcia II*.) The parties have submitted their supplemental briefs (Docs. 114-15 in *Garcia II*), and the issues are ripe for consideration.

## LEGAL STANDARD

"Res judicata, or claim preclusion, treats a judgment, once rendered, as the full measure of relief to be accorded between the parties on the same claim or cause of action." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887-88 (9th Cir. 2000) (internal quotations and citation omitted). Claim preclusion bars a subsequently filed action if the prior litigation (1) involved the same parties or their privies, (2) was terminated by a final judgment on the merits, and (3) involved the same claim or cause of action as the later-filed suit. *Id.* at 888.

The anti-claim-splitting doctrine, on the other hand, applies before the entry of a final judgment and "prevents a party from maintaining two separate actions involving the

same subject matter at the same time in the same court and against the same defendant." *Henderson v. Bonaventura*, 649 F. App'x 639, 641 (9th Cir. 2016) (internal quotation and citation omitted). When determining whether two actions have been improperly split, "the appropriate inquiry is whether, assuming that the first suit were already final, the second suit could be precluded pursuant to claim preclusion." *Id.* If the court determines that improper claim-splitting has occurred, it has discretion to "stay the second suit, dismiss it without prejudice, or consolidate the two actions." *Mason v. Montgomery Cty.*, Nos. PWG-13-1077, PWG-14-3718, 2015 WL 3891808, at *3 (S.D. Md. June 23, 2015) (internal quotation and citation omitted).

### DISCUSSION

Defendants correctly note that claim preclusion, rather than claim-splitting, is now the appropriate rubric for resolution the Court's order to show cause because a final judgment has been rendered in *Garcia I*. Because *Garcia I* and *Garcia II* involve the same parties, the dispositive question is whether the two actions share an identity of claims. "The fact that [claim preclusion] depends on an 'identity of claims' does not mean that an imaginative attorney may avoid preclusion by attaching a different legal label to an issue that has, or could have, been litigated." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1065, 1077-78 (9th Cir. 2003). "Identity of claims exists when two suits arise from the same transactional nucleus of facts." *Stratosphere Litig. LLC v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142 n.3 (9th Cir. 2002) (internal quotations and citation omitted). Stated differently, "[n]ewly articulated claims based on the same nucleus of facts may still be subject to a [claim preclusion] finding if the claims could have been brought in the earlier action." *Tahoe-Sierra*, 322 F.3d at 1078. Here, there is no doubt that the claims asserted in *Garcia II* derive from the same transactional nucleus of facts and could have been brought in the earlier action.

### I. Identity of Claims

The operative complaint in *Garcia II* contains (1) an action to quiet title and (2) a claim that Defendants violated A.R.S. § 33-420 by recording certain documents asserting

an interest in the Scottsdale property, such as an assignment of the deed of trust, a substitution of trustee, and a notice of trustee's sale. (Doc. 1-2 at 4-9.) Both claims are based on allegations that neither Chase nor BANA "own" or otherwise have a beneficial interest in the loan. It is amply clear from the Court's discussion of the relevant factual and procedural history of these two cases, however, that Defendants' relationship to Garcia's loan was at issue in *Garcia I*, and that the quiet title and § 33-420 claims asserted in *Garcia II* could have been brought in the prior action.

Indeed, Ms. Wilhite represented that the ownership issue was "directly relevant" to the negligence issues raised in *Garcia I* and "goes directly to all of our claims." (Doc. 66 at 10-11 in *Garcia I*.) Based on that representation, the Court permitted Garcia to pursue substantial discovery on the ownership question. Moreover, despite later contradictory representations about the relevance of the ownership issue to the claims asserted in *Garcia I*, Garcia continued to press the issue in written submissions in that case and, therefore, sought a decision on this issue. (*See* Docs. 102, 112, 141, 170 in *Garica I*.) Defendants extensively briefed the issue and evidenced their relationship to the loan in their summary judgment motion, but Garcia chose not to rebut Defendants' evidence and legal authorities. In fact, Garcia's counsel stated during oral argument that he could not see how Defendants' relationship to the loan could genuinely be at issue given the admissions in paragraphs 110 and 111 of Garcia's verified complaint. (Doc. 261 at 27-28 in *Garcia I*.) Consequently, the Court's summary judgment order, like Garcia's verified complaint, acknowledged that BANA purchased Garcia's loan and at all relevant times possessed it through Chase as servicer. In light of this history, it is disingenuous for Garcia to now argue that Defendants' relationship to her loan was not at issue in *Garcia I*, or that her present claims premised on allegations that Defendants do not own or otherwise have an interest in her loan could not have been brought in *Garcia I*.

The same is true for Garcia's proposed amended complaint in *Garcia II*. In addition to the quiet title and false recordings claims discussed above, the proposed amended complaint seeks a declaratory judgment that Defendants do not have an interest

in the loan and alleges claims for intentional interference with contractual relations, intentional/negligent infliction of emotional distress, fraud, and violations of the Arizona Consumer Fraud Act (ACFA). (Doc. 46-1 in *Garcia II*.) All of these claims fundamentally are based on allegations that Defendants do not have an interest in Garcia's loan and, therefore, acted improperly by negotiating a modification they allegedly were not authorized to provide and by initiating non-judicial foreclosure. (*See Id.* ¶¶ 110-150, 187-200, 202, 210-229, 234-236.) For reasons already discussed, Defendants' interest in Garcia's loan was partly the subject of *Garcia I*, and all claims asserted in *Garcia II*'s proposed amended complaint could have been brought in the prior action because they all fundamentally derive from this same ownership question.[2]

## II. Waiver

Garcia contends that dismissal is inappropriate because Defendants have waived the claim-splitting and *res judicata* defenses by not raising them. Although the Court raised claim-splitting and *res judicata* questions *sua sponte*, it disagrees that Defendants waived the issues.

First, though Defendants did not move to dismiss *Garcia II* for improper claim-splitting during the pendency of *Garcia I*, they consistently voiced concerns that the two cases overlapped factually and legally. For example, Defendants opposed Garcia's efforts in March 2016 to obtain discovery on the ownership issue in the context of *Garcia I* because Garcia had "just filed a quiet title action in [s]tate [c]ourt raising this issue with [WaMu] and so forth. So there's a whole [other] litigation in which the question of the bank's role is at issue, and we will address those issues in that lawsuit[.]" (Doc. 66 at 9-10 in *Garcia I*.) In June 2016, in response to Garcia's first motion to consolidate, Mr. Shely wrote to Garcia's counsel that Defendants were amenable to consolidation so long as the parties could agree not to duplicate discovery that had already occurred in *Garcia I*. (Doc. 178-1 at 6 in *Garcia I*.) Likewise, during the Rule 16 scheduling conference in

---

[2] Moreover, Garcia actually sought and litigated her entitlement to emotional distress damages in *Garcia I*. (*See* Doc. 203 at 15-18; Doc. 233 at 15-16 in *Garcia I*.)

*Garcia II*, Mr. Iannelli discussed the substantial discovery into the ownership issue that had already occurred in *Garcia I* and voiced concerns over needlessly duplicating those efforts in *Garcia II*. (Doc. 47 at 7-8 in *Garcia II*.) Finally, and perhaps most explicitly, Defendants actively opposed Garcia's September 2016 efforts to amend her verified complaint in *Garcia II* and to consolidate the two actions. Defendants argued that Garcia's proposed amended complaint largely duplicated claims already being litigating in *Garcia I*, and that amendment and consolidation "would eliminate the impact of all Defendants' work in *Garcia* I" and "require . . . Defendants to endlessly re-litigate this dispute again in the context of the proposed amended complaint in *Garcia II*." (Doc. 68 at 2 in *Garcia II*.) In short, although Defendants did not explicitly state a claim-splitting defense prior to the Court's order to show cause, they consistently objected to and voiced concerns over the duplicative nature of *Garcia II* and the discovery sought in that case.

Second, assuming that Defendants waived the claim-splitting issue through acquiescence, the same is not true with respect to the claim preclusion defense. Claim preclusion requires a final judgment in the prior action. Consequently, Defendants could not have raised the issue prior to April 5, 2017, when the Court entered summary judgment in *Garcia I*. When asked to brief the impact of the summary judgment in *Garcia I* on the claims asserted in *Garcia II*, Defendants promptly raised the claim preclusion defense. Accordingly, the Court finds no waiver that would salvage Garcia's second lawsuit.

**III. Prejudice**

Lastly, Garcia argues that dismissal is inappropriate because the Court delayed ruling on the claim-splitting issue until after a final judgment was entered in *Garcia I*. She contends that this delay was prejudicial because, absent a final judgment in *Garcia I*, claim preclusion would not have barred her claims in *Garcia II* and the rule against claim-splitting would not have required dismissal. The Court disagrees.

As previously noted, the claim preclusion and claim-splitting analyses are substantially the same. Under the former, the Court considers whether a subsequently

filed action is barred by a final judgment in a prior action involving the same parties and an identity of claims. *Hydranautics*, 204 F.3d at 887-88. Under the latter, the Court considers whether, assuming the earlier-filed action were already final, the second suit could be barred by claim preclusion. *Henderson*, 649 F. App'x at 641. Thus, the entry of a final judgment in *Garcia I* did not alter the substantive legal analysis necessary to resolving the Court's order to show cause, and for the reasons stated in this order the Court would have found improper claim-splitting had it ruled prior to entry of the final judgment in *Garcia I*.

The meaningful difference between claim-splitting and claim preclusion is the remedy. Whereas claim preclusion bars the later-filed action, if the Court determines that improper claim-splitting has occurred, it has discretion to "stay the second suit, dismiss it without prejudice, or consolidate the two actions." *Mason*, 2015 WL 3891808, at *3 (internal quotation and citation omitted). Accordingly, the Court understands Garcia to be arguing that, had the Court ruled on the claim-splitting question before the entry of final judgment in *Garcia II*, it could have remedied the improper claim-splitting through either of the two less drastic sanctions. Garcia's argument is misguided.

Garcia's litigation conduct, and not the timing of this Court's order, effectively removed consolidation as a workable remedy. Throughout this litigation, Garcia has not pursued consolidation consistent with its purposes. When she first moved to consolidate the matters, Defendants were amenable to consolidation so long as discovery that was common to both matters and had already been completed in *Garcia I* was not duplicated for purposes of *Garcia II*. This request was reasonable, and the Court would have consolidated the two cases at that early stage had Garcia not inexplicably withdrawn her request and made a series of contradictory representations about whether consolidation truly was appropriate.

Later, during the Rule 16 scheduling conference in *Garcia II*, the Court invited a renewed consolidation request. In fact, the Court explicitly voiced concerns that the claims in *Garcia II* could be barred by *res judicata* principles if the matters were not

consolidated and *Garcia I* proceeded to a final judgment on the merits. (Doc. 47 at 5-7 in *Garcia II*.) Despite the Court's concerns, counsel for Garcia declined the Court's invitation to renew her consolidation request.

Thus, Garcia had two opportunities to consolidate these matters early in this litigation, at a time when Defendants would not have been prejudiced by consolidation, and in a manner that would have avoided needless duplication of resources. Instead, Garcia chose to duplicate discovery and litigate both cases simultaneously. Only after Defendants had filed a series of Rule 37 motions in *Garcia I*, and at a time when Defendants could articulate clear prejudice, did Garcia again reverse course and move for consolidation. Indeed, Garcia also sought extensions of deadlines in *Garcia I*.

Concurrent with the issuance of its order to show cause on the claim-splitting issue, the Court denied Garcia's latest motion to consolidate the two cases. (Doc. 81 in *Garcia II*.) In so doing, the Court found that "the *Garcia II* action was brought as a strategy to get around the requirements of *Garcia I*" and "instead of filing a motion to amend you filed a second lawsuit that involved the same claims, same issues, same parties. And a second shot at discovery, a second shot at additional damages that apparently weren't properly pursued in the first case." (Doc. 91 at 35-36 in *Garcia II*.) The Court also refused to stay or extend the deadlines in *Garcia I*.

Having already denied Garcia's September 2016 consolidation request, and having refused to stay or extend the deadlines in *Garcia I*, consolidation ceased to be viable option considering *Garcia I*'s procedural posture. Had the Court ruled on the claim-splitting issue prior to the entry of final judgment in *Garcia I*, it therefore would have been left with two options: it could have (1) stayed *Garcia II* pending the outcome of *Garcia I* or (2) dismissed *Garcia II*. By deferring a ruling on the claim-splitting question until after resolution of *Garcia I*, the Court chose the less drastic of these two remedies, affording Garcia the benefit of the doubt that some or all of the claims asserted in *Garcia II* could survive a final decision in *Garcia I*. Garcia cannot credibly argue that she has been prejudiced by the Court's choice such that the Court should disregard claim

preclusion principles and allow her to litigate claims that could and should have been brought in the prior action.

## CONCLUSION

For the foregoing reasons, the Court finds that the final judgment entered in *Garcia I* precludes Garcia from pursuing the claims asserted in *Garcia II*, all of which fundamentally are premised on allegations that Defendants have no interest in her loan. These claims all are based on the same transactional nucleus of facts as the claims asserted in *Garcia I* and therefore could and should have been brought in that litigation. Indeed, Garcia's early consolidation request—which she inexplicably withdrew and later repeatedly contradicted—demonstrates that the claims at issue in *Garcia II* are sufficiently related to the claims decided in *Garcia I* that the matters could have been litigated together. Garcia has never offered satisfactory explanations for her decisions to bring these suits separately and to withdraw her first consolidation request, or for her contradictory statements about the relationship between the two actions. In the end, Garcia twice forewent early opportunities to consolidate these matters and, instead, made a strategic decision to try these matters separately, despite concerns voiced by Defendants and by the Court that a final judgment in the *Garcia I* could have *res judicata* effects on *Garcia II*. Now that those circumstances have come to pass, the Court finds that this matter is subject to dismissal under claim preclusion principles.

**IT IS ORDERED** that this matter is **DISMISSED** pursuant to the Court's order to show cause (Docs. 80, 112.) The Clerk shall terminate all pending motions as moot and close this case.

Dated this 21st day of June, 2017.

Douglas L. Rayes
United States District Judge

- 24 -